# APPENDIX.

## STATE *versus* VERRILL.

DICKERSON J. — This case comes before the court on a motion for a new trial, on newly discovered evidence. The motion is based principally upon the confessions of Clifton Harris, a negro, who was the principal witness against the prisoner, and who was convicted of the same murder on his own confession. Since the verdict against the prisoner, Harris has confessed under oath that he committed the murder unaided and alone, and that the prisoner is innocent.

The motion for a new trial, after verdict, in civil cases, is not founded in absolute right, but is addressed to the discretion of the Court, and is grantable only when it is in furtherance of substantial justice. If, upon a view of the whole case, it appears that justice has been done in the premises, and that the verdict is substantially right, no new trial will be granted, though there may have been some mistakes committed at the trial, or a failure to introduce all the evidence that would make in favor of the losing party. 1 Pet., 170.

In civil cases, a new trial will be granted where a principal witness, whose testimony was adverse to the party applying for a new trial, has ascertained that he was mistaken in a material part of his testimony; or when such witness is guilty of perjury, or there is evidence showing subornation of perjury; or where it is discovered that a party has made confessions inconsistent with his right to prevail in the suit; or where new and material evidence has been discovered which could not have been known to the defeated party by the exercise of proper diligence. But in al[ such cases the applicant for a new trial must furnish the court with sufficient evidence to warrant the belief that the allegations in his motion are true in fact, as well as in his own

opinion, or in the mind of the witnesses called to substantiate them. It is not sufficient that a witness THINKS that he was mistaken in his former testimony; the Court must be satisfied that he was in fact mistaken, before it will grant a new trial; otherwise there would be danger that unscrupulous litigants might induce such belief in the mind of witnesses of weak intellect, when no such mistake had in fact been committed; and the wholesome maxim of the law, that it is for the interest of the republic that there shall be an end of litigation, would be thereby violated. *Warren* v. *Hope*, 6 Maine, 477; *Hewey* v. *Nourse*, 54 Maine, 256; *Fabrillius* v. *Cox*, 3 Burr. 1771; *Great Falls Man. Co.* v. *Matthews*, 4 N. H., 574.

If a new trial may be granted for these causes, in civil suits, where the verdict is predicated upon a mere preponderance of evidence, and affects only the property or the reputation of a jury, shall a new trial be refused, under the same circumstances, in a criminal case, where the law presumes that the accused is innocent, until every reasonable doubt of his guilt is removed, and the verdict deprives him of his personal liberty, or even of life itself? How, too, can the Court stand acquitted before the tribunal of conscience in refusing to grant a new trial, and in pronouncing the extremest sentence of the law, when, if the accused were sued in an action at law, it would be authorized to allow him to re-try his case.

The law, in its humanity, guards the personal liberty and life of the citizen with its protecting shield, as well as his property and reputation. Indeed, the more serious the consequences of a verdict are to a party, the greater the necessity that a discretionary power should be reserved in the Court to give him an opportunity to re-try his case, when, from some irregularity in the proceedings at the trial, or some mistake, or perjury of the witnesses, or newly discovered evidence, there is probable ground for apprehension that the verdict is wrong. The principles which regulate judi-

cial discretion in granting new trials are substantially the same in criminal as they are in civil cases.

The constitutional provision, that the accused shall not be put in jeopardy of his life but once in the same case, is a personal privilege, secured to him for his benefit, which may be waived by him, at any time, for the same purpose. Besides, where sufficient cause exists for granting a new trial, and one is granted, it is as though no trial had been had in the case. So scrupulously does the law guard the rights of the accused, that the Court in New Hampshire granted a new trial in a capital case, where there had been an improper separation of the jury during the trial, though there was no evidence that the prisoner had been prejudiced thereby, on the ground that, as the law presumes the accused to be innocent until his guilt has been proved beyond a reasonable doubt, he is entitled to the benefit of the presumption that a disregard of the provisions for his security had been prejudicial to him, and that he is at least entitled to require, at the hands of the government, satisfactory evidence that he has not received detriment from such irregularity, and is not required to show, affirmatively, that such departure from the customary mode of trial has been the probable cause of his conviction. *State* v. *Prescott*, 7 N. H., 287 ; 18 Johns., 218.

It has been repeatedly held that a separation of the jury under like circumstances, in civil causes, affords no ground for a new trial; and the reasoning of Mr. Justice Parker, in *State* v. *Prescott*, is consistent with this distinction. If the law, in its jealous watchfulness of the rights of the accused, requires a more strict observance of the recognized course of proceedings in criminal than in civil trials, it would seem that at least as broad and liberal judicial discretion may be exercised in the former as in the latter class of cases. In *Fabrillius* v. *Cook*, 3 Burrow, 1771, the defendant moved for a new trial, on the ground that " the whole was a fiction supported by perjury, which he could not be prepared to answer; that since the trial many cir-

cumstances had been discovered to detect the iniquity and to show the subornation of witnesses." The Court, after a strict scrutiny of the newly discovered evidence, believed it to be true, and granted a new trial, and the plaintiff never dared to try the case again, though at the trial a verdict was rendered in his favor for £2400. So in *Thurrell* v. *Bowman*, 1 Bing., 339, the Court granted a new trial on affidavits disclosing a conspiracy against the defendant which did not come to his knowledge till after the trial.

Though the reported cases of new trials, granted because of the insufficiency of the evidence, or the discovery of new evidence, or other causes, are less numerous in criminal than in civil cases, yet, when they do occur, they are found to rest upon the same broad views of enlightened jurisprudence. In *Grayson* v. *The Commonwealth*, 6 Grattan, 712, a capital case, the Court granted a new trial because there was not sufficient evidence to justify the verdict. In *Wise* v. *Georgia*, 24 Geo., 31, which was an indictment for stealing part of a harness, a new trial was ordered upon the discovery of a witness who was present when the harness was lent to the accused. So in the recent case of *Commonwealth* v. *Smith*, tried before Judge PUTNAM, of the Superior Court of Massachusetts, where the respondent was charged with subornation of perjury, a new trial was granted upon affidavits and oral testimony that the principal witness for the Commonwealth confessed, after the trial, that he testified falsely, and did so because the prosecutor had agreed to provide for him and his family. The evidence of the perjury was so conclusive that the district attorney entered a *nol. pros.* in the case, against the respondent's protest and his demand for a trial.

The general rule, founded alike in reason and experience, which regulates the exercise of judicial discretion upon a motion for a new trial on account of newly discovered evidence, requires that the evidence shall be distinct in its character from the evidence introduced at the trial, and not cumulative, that it could not have been known to the party

State *v.* Verrill.

by proper diligence, that it appears to the Court to be true, and is calculated, with the other evidence, to reverse the verdict. If either of these requirements is wanting in the evidence offered, a new trial will not be granted. It is not the business of courts to relieve parties from the consequences of their own negligence, or of the unskilfulness of their counsel; and it would be a mockery of justice to send back a case for a second trial, upon newly discovered testimony, which ought not to influence the action of a jury, or to ask a jury to pass upon evidence which the Court itself has not probable grounds for believing, and which is insufficient to change the result. Hence, in determining the question before the Court, it becomes necessary carefully to scrutinize, not only the new evidence offered, but also the evidence introduced at the trial.

At an adjourned term of this Court, held by Judge WAL-TON, at Auburn, in the county of Androscoggin, in July last, the prisoner, Luther J. Verrill, whose age is forty years, was found guilty of the murder of Mrs. Susannah Kinsley, on the night of the sixteenth day of last January. At the same term of the Court, one Clifton Harris, a negro, aged nineteen years, was convicted and sentenced for the same murder, upon his own confession. On the trial of the prisoner, Harris was a witness for the State, and testified that, on his return home from Lewiston, in the early part of the evening of the 16th of January, in a sleigh, he met the prisoner, who asked him " if he didn't want to go with him to the house to get some money." Harris asked the prisoner " where the house was," and the prisoner replied, — "the next house to Otis', — you know where it is, Mrs. Kinsley's." After some further conversation, Harris testified that he agreed to meet the prisoner at " Mrs. Kinsley's" between twelve and one o'clock; that he went home and went to bed, got up a little past twelve o'clock, met the prisoner at Mrs. Kinsley's; entered the house clandestinely; let the prisoner in; and that he and the prisoner together perpe-

trated one of the most diabolical murders known to the annals of criminal jurisprudence.

When confronted by Harris for the first time, immediately after he was suspected, and accused by Harris of being an accomplice, the prisoner was asked by the prosecuting officer,—" well, Verrill, what have you to say to this?" The prisoner replied—" *I have this to say; every word is false and I can prove where I was.*" Though a witness in his own behalf at the trial, and subjected to a long, searching and exhaustive cross-examination, the evidence, carefully reported by a stenographer, does not disclose, nor is. it claimed, as I understand, that he has since made any declaration inconsistent with that assertion.

Eight other witnesses, whose attention was called to the subject soon after the murder, and who composed the family in which Verrill boarded, testified, at the trial, that he came to his boarding house that evening at an early hour, retired to his bed at the usual time, and did not, to their knowledge, leave the house again that night.

On the contrary, Harris has repeatedly, on several occasions and to several individuals, retracted the charge he made against the prisoner, and swore to at the trial, and confessed that he testified falsely, and that he perpetrated the murder unaided and alone.

In addition to his affidavit of July 29, 1867, in which he swore that he committed the murder alone, he subsequently made a more extended confession to the Rev. George W. Quinby, of Augusta, at the jail in that place, in the presence of Sheriff Parker, of Lewiston, who was taking him to the State Prison. Mr. Quinby testifies that, after some preliminary conversation, Harris said,—" I will tell you two gentlemen the truth now; Mr. Littlefield (the jailer in Auburn) told me, when I started from the jail, to tell Mr. Parker just the truth, and I will; and the truth is, gentle-,men, Verrill was not there that night, and knew nothing about it at all. I did the whole myself,—everything,—this is true, so help me God. That, if he was on the gal-

lows or at the bar of God, he would say so." He further said, that "he went to Lewiston to see his girl, and that he had no chance to see her much,—that the first time he thought of going to Mrs. Kinsley's was when passing there; that he came back hoping to sleep with the women and get some money too; that, after entering the house, he went to Mrs. Kinsley's room; that she did not awake; that he put his hand upon her shoulder and asked her to turn over; and that she immediately rose up in bed. He told her to keep quiet and she would not do it, and he attempted to force her down, when a desperate struggle ensued, Mrs. Kinsley calling loudly for Polly. He then got off the bed and struck her on the head with a chair. Polly appearing, he dealt her a blow. He struck Mrs. K. several times till she was still. All this deprived him, he said, of the passion which had influenced him; still, he said, what he said of Verrill (at the trial in regard to the nameless crime committed by him) was true of himself. He then asked her where the money was, but not till he used his knife did she tell him; after searching in vain for the money he came away. In answer to the inquiry, how he came to implicate Verrill, he replied, he thought they would not be so hard with him, if there was another with him, and he had heard said, that a man could get clear by turning State's evidence.

Mr. Parker, sheriff of this county, corroborates the affidavit of Mr. Quinby, and relates the last conversation he had with Harris, as he was about to take his leave of him at the State Prison, as follows:—"After our arrival at the State Prison, and the shackles were taken off, and I was about to leave, I told Harris I should probably never see him again, and he would probably be hung. I asked him if he wished to correct the statement he made to us at Augusta. He said he did not, and lifting his right arm, he said, 'Mr. Parker, I did that thing alone before God.' These were his last words."

That the evidence of Harris' recantation and confessions is newly discovered; that it differs in character from any evi-

State *v.* Verrill.

dence offered by the prisoner at the· trial, and that no dili-
gence whatever on his part could have obtained this evi-
dence before the trial, does not seem to be questioned.
Nor can its materiality, if true, be doubted, since it com-
pletely exculpates the prisoner from all connection whatever
with this atrocious murder.

Are the confessions of Harris probably true, and are they
calculated when considered with the other evidence, to
change the verdict? As this question shall be answered, so
must the prisoner's motion be decided. After allowing to
the testimony introduced at the trial, relative to the hatchet,
the knife, the unknown man and the hair, all the force due
to it as corroborative evidence, it is quite clear that this
alone, without Harris' testimony, is not sufficient to war-
rant the conviction of the prisoner. His was the original,
substantive, and that the incidental and dependent testimony.
Without the nutriment drawn from the trunk the branches
lose their vitality. His testimony quickened and vitalized
all the rest. Such must have been the view taken of it by
the jury. Such *was* the opinion of the presiding Judge,
who instructed the jury that " the facts alone, independent
of the negro's testimony, and without it, were of a very
weak and inconclusive character, scarcely sufficent to create
a well founded suspicion."

Ordinarily confessions are among the least reliable species
of testimony. Such are the imperfections of memory, and
the infirmities of human nature, that it is exceedingly diffi-
cult for the narrator to convey to the hearer the exact idea
of the speaker. But when this is done, confessions are the
most satisfactory kind of evidence, owing to the improba-
bility that a party would falsely criminate himself. Harris
has been convicted of the very crime charged against the
prisoner, upon his own confessions alone. If his confessions
to the Rev. Mr. Quinby and Mr. Parker are true, he is
also guilty of perjury. Were these confessions actually
made, as they have been testified to? They come from
sources at once intelligent and above suspicion. To deny

the correctness of the narrators would be to sap the foundations of human testimony. It is not for a moment to be questioned that Harris said what these witnesses testify to. There is no evidence that these confessions were elicited through the instrumentality or knowledge, or at the suggestion of the prisoner or his counsel. On the contrary, the high sources from which they come emphatically negative such hypothesis, and prove that they were made freely and voluntarily, and without fear, favor or hope of reward.

According to the well established rules of evidence, they thus become the most satisfactory kind of evidence. The changed condition and relations of Harris, from what they were when he gave his testimony, are worthy of consideration, when we come to consider the credibility of his confessions. Then, though a confessed murderer, he may have indulged the hope that a generous public, always prone to be lenient in its judgment of those who in early life and inexperience have been persuaded to act a subordinate part in the commission of crimes by more mature and controlling minds, would excuse his crime on this account, or that the executive clemency might be extended to him, if not in granting a pardon, at least, in commuting the awful sentence of death to imprisonment for life. Now that he has had time for reflection, such motive may have lost its force. Nor would it be incredible or strange that when, on the morning of the seventeenth of January, he woke to the terrible realities of his deeds of blood and infamy of the previous night, he should have been so crushed with the weight of his solitary guilt, as to be compelled to look about for another to share the damning weight of the burden with him. The history of criminal jurisprudence abounds in such instances. His acquaintance with the prisoner for a brief period, and by no means of a very marked character, could scarcely have inspired in him that degree of friendship which makes one's self forever infamous to screen a murderer from his crimes. The fellowship of bad deeds is not apt to beget such devotion. On the contrary, if the

guilt of the prisoner brought Harris to the threshold of the
scaffold, the intensity of his indignation toward his seducer
would naturally increase as the day of his execution ap-
proached.   Every impulse of his nature bade him adhere
to his first statement.   It is hardly within the range of hu-
man credulity that Harris expected to derive any advantage
from adding the crime of perjury to those of burglary, rape
and murder.

.   On the contrary is it not highly probable that conscience,
hitherto unheeded in its solemn protests against the mon-
strous wrong of accusing an innocent man of so atrocious a
crime, at last obtained the mastery over selfishness, passion
and perjury, and wrung from his reluctant and perjured
heart that tribute of justice to the prisoner so long and cru-
elly withheld?

The evidence adduced at the trial, aside from Harris' tes-
timony, is perfectly consistent with the theory that the
murder was committed by one and the same hand.   More-
over, the testimony of Harris bears intrinsic marks of im-
probability.   The selection by Verrill of a bright, moonlight
night, in which to commit a burglary, Harris' accidental
meeting with Verrill, having a hatchet in his hand, beyond
and going from Mrs. Kinsley's, as if hunting for an accom-
plice, and ready to select the first man he met, after he had
armed himself for the deed; Harris' ready assent to join in
the work, assigning as his only objection that " he had his
team there;" the mysterious whereabouts of Verrill during
the long, wearisome hours of a cold January night, spent be-
tween the time they first met and their final meeting at Mrs.
Kinsley's; the throwing of Harris' clothes into the little
window, after he had been unable to get in with them on,
and was uncertain whether he could succeed with them off,
instead of handing them to his accomplice; the neglect of
both to take any matches, or to strike a light, when the ob-
ject was to obtain money, and matches were subsequently
found scattered over the floor; the instant seizure of Mrs.
Kinsley by Verrill and striking her with a chair, when no

violence was contemplated, or called for, if but money was their motive; the feeble effort and failure to find money, though it might readily have been discovered, and there was ample opportunity for search, with none to molest them, and the pregnant fact that a crime was committed different from that contemplated and avowed by Verrill to Harris at their first meeting, but a crime for which *Harris is proved to have had an uncontrollable passion*, and which, in his confession he declares was the chief object of his adventure, and *was actually committed by him alone,*—all these circumstances together stamp the story of Harris at the trial as unsatisfactory, improbable, incredible and untrue.

If we turn to Harris' confession we find no such marks of improbability. He spent the first part of the evening in an unsuccessful attempt to gratify a sensual appetite, which had been cultivated from the early age of fifteen, and had repeatedly impelled him to enter the houses of his neighbors clandestinely, and conceal himself in the sleeping apartments of unsuspecting females. He had that evening failed in the attempt to gratify his lust. He first thought of going to Mrs. Kinsley's as he passed by her house that night, with this passion still upon him. He was familiar with the premises, and knew that none but females resided there. He returned for the avowed purpose of gratifying his insatiate lust. Having entered the house, he stealthily went to Mrs. Kinsley's apartment. She did not awake and "*he put his hand on her shoulder and asked her to turn over.*" She immediately rose up in bed. He told her to lie down and keep quiet; she refused to do so, and he attempted to force her down. A desperate struggle ensues; Mrs. Kinsley calling loudly for "Polly." Unable to master Mrs. Kinsley, he gets off the bed and strikes her with a chair. Polly appearing he deals her a blow, and fells her to the floor, and beats Mrs. K. till she is quiet.

He then accomplishes his fiendish purpose, in the commission of the same crime which he charged upon Verril, and the loathsome language he attributed to him was but

the expression of his own wanton feeling. He makes but a slight search in the dark for money, and goes home.

His reasons for accusing Verril are declared to be, that he thought that they would not be so hard with him if there was another with him, and he "had heard said" that a man could get clear by turning State's evidence !

This is a plain, straight forward and consistent story, and bears the impress of its own intrinsic verity. It may also be added, that his narrative harmonizes with the probable statements testified to by him on the trial, and conflicts with those which are improbable.

In addition to the confession of Harris, a new trial is claimed on the affidavit of Richmond Gowell. John A. Berry and Benjamin Hill testified at the trial, that they saw a man going in the direction where Harris says Verrill was going, at the time he would have been likely to meet Harris according to Harris' story. Gowell testified that he was on the road about that time near that place, and other witnesses corroborate his statement. Without detailing the evidence upon this point, it may suffice to say, that the balance of testimony shows that Gowell was the man testified to by Berry and Hill. Thus, what was regarded as a most important corroboration of Harris' story, is substantially disproved, and the confession of Harris further confirmed.

The confession of perjury, and the confession of mistake by a witness are placed on the same footing with respect to the granting of new trials. In neither case will a new trial be granted unless there is probable ground for the Court to believe that the perjury or mistake has been actually committed. It may require stronger evidence to satisfy the Court of the perjury than of the mistake, but when satisfied, its duty is as clear in the one case as in the other. Such satisfaction may be derived from the intrinsic improbability of the former testimony, the probability of the facts as confessed, the changed condition or relations of the witness, and the motives operating upon him on the two occasions, or other evidence corroborating the confession. There is

no necessity of the conviction of the witness, for perjury before the confession can be available, any more than there is of a trial for murder, before the accused can be convicted when he pleads guilty.

Harris is now under sentence of death, solely upon his own confession, that he committed the crime of which Verrill has been found guilty almost exclusively upon his testimony. If the law believes his confession of murder, may not the Court credit him, when he confesses that he committed perjury to divide the guilt, or escape the punishment due that crime? And if the Court believes his confession, shall the prisoner be denied the right of submitting that confession to a jury of his country in connection with the other evidence in the case, and be turned over to the clemency of the executive for redress?

Who would expect that the Governor would throw open the door of mercy to the prisoner after the Court had closed the temple of justice against him? It will be time enough to ask a pardon of the Executive when the prisoner has no longer a right to demand justice of the Court. God grant that until that point shall have been reached, no citizen of Maine may be compelled to beg for mercy of the Executive.

I have dwelt more at length upon the question before me than I otherwise should have done, but for its great importance to the prisoner and the State, and the frank avowal by the Attorney General, of his intention to enter a *nol. pros.* if a new trial is granted. Considering the knowledge which the Attorney General has of this case, the signal ability with which he has conducted the prosecution through all its various stages, and his known fidelity to the interests of the State, this announcement confirms and strengthens my convictions that he ought not to hold the verdict that has been rendered.

This timely suggestion of the Attorney General has admonished me to examine, compare, analyze and weigh, both the new evidence and that introduced at the trial, with the greater care, and in the light of both judge and jury, as the

double consequences attending a determination by both these tribunals, to the prisoner and the State, are to follow my decision. This consideration has, also, led me to state the grounds of my conclusion more at length, as such statement can have, no effect for or against the prisoner, or the State, in any subsequent proceedings in the case.

In view of the evidence before me, the enlarged discretion which the law, in its humanity, reposes in the Court, and the responsibilities of the situation, I can come to no other conclusion than that the prisoner is clearly entitled to a new trial.

I am authorized to say that Judge WALTON, who tried the case, and who has been present at this hearing, fully concurs in the conclusion to which I have arrived; and we are both of the opinion that the circumstances of the case warrant the disposition which the Attorney General has proposed to make of it.

# TAXATION OF NATIONAL BANKS.

HOUSE OF REPRESENTATIVES, February 26, 1867.

ORDERED,—That the Justices of the Supreme Judicial Court are hereby requested to give their opinions upon the following questions:—

1st. Does the law of Congress, creating National Banks and Banking Associations, require that all taxes assessed by virtue of State law on the shares of such banks, shall be applied to the use and benefit of the city or town in which the same is located, where shares in such banks are owned in some other city or town in this State?